## MOYLER v. MOYLER.

1. To constitute legal cruelty, to authorize a divorce, there must be actual violence committed, attended with danger to life, limb or health; or there must be a reasonable apprehension of such violence.
2. The throwing a bucket of water on the wife in bed, with a threat of further violence if she did not leave the house, is legal cruelty.
3. Abusive language, and other unbecoming conduct, not amounting to legal cruelty, may be received in aggravation of an act of cruelty.

Moyler v. Moyler.

4. The answer of a defendant denying the allegations of the bill, does not make it necessary to prove them by two witnesses. Proof by one is sufficient.

Error to the Chancery Court sitting at Limestone.

THE bill was filed by the plaintiff in error, for a divorce *a vinculo*, upon the ground of cruel, barbarous, and inhuman treatment on the part of the husband; this the bill charges in general terms to have commenced soon after the marriage, and to have been continued until the separation. The bill also specifies the following instance of cruelty : that on one occasion, at night, after they had retired to bed, he pulled her out of bed, in a rude and angry manner, and at the same time threw a bucket of water over her, threatening to take her heart's blood, if she did not leave his house before morning ; at the same time cursing, and abusing her in the most cruel and in inhuman manner. At another time he shook his fist in her face, and threatened to cut her throat, heaping upon her at the time, the coarsest and most abusive epithets, without any provocation on her part. These are stated in the bill, as instances merely of his general conduct. It contains also the necessary allegations to give the court jurisdiction, and prays a divorce from the bonds of matrimony.

The defendant in his answer, denies the allegations of the bill, and insists that the true cause of her leaving him, was that he was unable to support her in the rank and style in which she desired to live. The answer is not sworn to.

Much testimony was taken, which is sufficiently stated in the opinion of the court.

The chancellor upon an examination of the testimony, considered that the charge of cruelty was not established by two witnesses, or by one with corroborating circumstances, so as to countervail the denial of the defendant in his answer, and dismissed the bill·

E. J. JONES, for plaintiff in error.

This is a bill for divorce, on the statutory grounds of cruel,

barbarous and inhuman treatment. The charges are both general and special.

Defendant answers, denying the general and specific charges. The answer is signed by his solicitor, but not by himself, or sworn to.

The main question in the case is as to the conclusion the chancellor attained on the examination of the evidence. We think the evidence required a decree for complainant.

In the prosecution of this inquiry, we may find it important to make the following points:

1. The answer, not being sworn to, should not be treated as an answer.

2. The rule of law, requiring two witnesses, or one witness and strong corroborating circumstances to overbalance the denial of an answer, does not apply to cases of divorce.

3. Or, at any rate, does not apply when the answer is not sworn to. [Lovell v. Steam Saw-mill Company, 6 Paige, 59.]

4. Mere words, unaccompanied with personal violence, may amount to this statutory ground of divorce.


L. P. WALKER, contra.


ORMOND, J.—The statute of this State, enumerates specifically the causes for which divorces may be granted, and amongst others, where the husband's treatment of his wife is " cruel, barbarous and inhuman." This bill is filed for a divorce for this cause. It has not hitherto been determined by this court, what acts or conduct on the part of the husband, will entitle the wife to a divorce for this cause, and as it is directly presented upon the record, and necessary to be decided, we will first proceed to the consideration of that question.

It is the policy of that country from which we derive our laws, as well as our social and domestic habits, not to grant divorces for trivial causes, and that such is the policy of this State, is manifest from the act, a part of which has been cited; in which the legislature, have accumulated expressions, of nearly equivalent import, as if for the purpose of hedging it round with difficulties. Nor can it be doubted that this

policy, harsh though it may seem upon a hasty glance, is conceived in the most profound wisdom.

Marriage is the most important of all the social relations. Upon the strict observance of its duties, by the married pair, depends not only every thing which ministers to comfort and happiness, but also to private virtue. A facility of obtaining divorces, not only tends to generate discord in families, by removing the restraints which necessity imposes, of a conformity to the habits, opinions, and even to the caprices of each other, from the conviction that the tie is indissoluble, but it also leads to licentiousness, and the disregard of the offspring of the marriage, and thus saps the very foundation of domestic happiness, and public virtue. Historians trace the decline of public morals, in ancient Rome, to this cause, more than to any other; and it cannot be doubted that the State in its political capacity, has a deep interest in this question.

The ecclesiastical courts of England, to whom this important duty is entrusted, are the repositories of the learning upon this subject, and under the guidance of a series of eminent men, it has been perfected into a system. The case of Evans v. Evans, 2 Haggard, 35, is the leading case upon the subject of "cruelty." Sir William Scott in his judgment, says, that to constitute legal cruelty, there must be reasonable ground to apprehend danger, to life, limb, or health. He proceeds to say: "This however must be understood, that it is the duty of courts, and consequently the inclination of courts, to keep the rule extremely strict. The causes must be grave and weighty, and such as show an absolute impossibility, that the duties of the married life can be discharged. In a state of personal danger no duties can be discharged; for the duty of self-preservation must take place, before the duties of marriage, which are secondary, both in commencement, and obligation.

What merely wounds the mental feelings, is in few cases to be admitted, where they are not accompanied with bodily injury, either actual or menaced. Mere austerity of temper, petulence of manners, rudeness of language, a want of civil attention, and accommodation, even occasional sallies of passion, if they do not threaten bodily harm, do not amount to

legal cruelty; they are high moral offences in the marriage state undoubtedly, not innocent surely in any state of life, but still they are not the cruelty against which the law can relieve. Under such misconduct of either of the parties, for it may exist on one side, as well as on the other; the suffering party must bear in some degree the consequences of an *injudicious connection; must subdue by decent resistance, or by prudent conciliation, and if this cannot be done, both must suffer in silence.* And if it be complained that by this inactivity of the courts much injustice may be suffered, and much misery produced, the answer is, that courts of justice do not pretend to furnish cures for all the miseries of life. They redress, or punish gross violations of duty, but they go no further; they cannot make men virtuous, and as the happiness of the world depends upon its virtue, there may be much unhappiness in it, which human laws cannot undertake to remove.

Still less is it cruelty, where it wounds not the natural feelings, but the acquired feelings, arising from the particular rank and situation; for the court has no scale of sensibilities, by which it can guage the quantum of injury done and felt; and therefore, though the court will not absolutely exclude considerations of that sort, where they are stated merely as matters of aggravation, yet they cannot constitute cruelty, where it would not otherwise have existed; of course the denial of little indulgencies, and particular accommodations, which the delicacy of the world is apt to number among its necesscries is not cruelty. It may to be sure be a harsh thing to refuse the use of a carriage, or the use of a servant: it may in many cases be extremely unhandsome, extremely disgraceful in the character of the husband; but the ecclesiastical court does not look to such matters; the great ends of marriage may be very well carried on without them; and if people will quarrel about such matters, and which they certainly may do in many cases with a great deal of acrimony, and sometimes with much reason, yet they must decide such matters as well as they can, in their own domestic *forum.*

These are the negative descriptions of cruelty, they show only what is not cruelty, and are yet perhaps the safest definitions which can be given, under the infinite variety of possi-

ble cases that may come before the court. But if it were at all necessary to lay down an affirmative rule, I take it, that the rule cited by Dr. Beaver, from Clarke, and the other books of practice, is a good general outline of the canon law, the law of this country upon this subject. In the older cases of this sort which I have had the opportunity of looking into, I have observed that the danger of life, limb, or health, is usually inserted as the ground upon which the court has proceeded to a separation. This doctrine has been repeatedly applied by the court, in the cases that have been cited. The court has never been driven off this ground. It has been always jealous of the inconvenience of departing from it, and I have heard no one case cited, in which the court has granted a divorce without proof given of a *reasonable apprehension* of bodily hurt. I say an *apprehension*, because assuredly, the court is not to wait till the hurt is actually done; but the *apprehension* must be *reasonable;* it must not be an apprehension arising merely from an exquisite and diseased sensibility of mind. Petty vexations applied to such a constitution of mind, may certainly in time wear out the animal machine, but still they are not cases of legal relief: people must relieve themselves as well as they can by prudent resistance—by calling in the succors of religion, and the consolation of friends; but the aid of courts is not to be resorted to with any effect."

We have been induced to make this long extract, not only from its exquisite beauty and justness of thought, and language, beyond any thing we could furnish, but because it places in the clearest, and strongest point of view, the law, and the reason upon which it is founded, and has, ever since it was pronounced, been considered as settling the rule in England, as to what constitutes legal cruelty, in cases of this kind. Thus it is said, in Lockwood v. Lockwood, 2 Curteis, 281, "There must be either actual violence committed, attended with danger to life, limb, or health, or there must be a reasonable apprehension, of such violence. This I apprehend to be the substance of the doctrine laid down in Evans v. Evans, 1 Hagg, C. R. 35, cited in the argument in this case, and other subsequent cases."

With this exposition of the law applicable to cases like the present, we proceed to the consideration of the allegations,

and proof in this cause. The bill charges, that within two weeks after the marriage, the defendant began a course of cruel, and inhuman conduct towards her, which he continued until the separation, and that she was forced to abandon him, from fear of personal violence. One act of violence, which is specified, alledges, that after they had retired to bed, he pulled her out in a rude and angry manner, throwing a bucket of water over her, and cursing and abusing her in the coarest manner, and threatening to take her heart's blood, if she did not leave his house before morning. This is fully proved by the witness, Campbell, who boarded in the house, and he states the additional aggravating circumstance, that the defendant, after throwing a bucket of water over his wife in bed, would have put her out of doors in the night, if the witness had not prevented it. This atrocious act, is fully within the strictest definition of legal cruelty. The same witness proves, that he saw him on one occasion, throw a glass of milk in her face at table, and another, Nancy Critz, saw him shake his fist in her face. Many witnesses prove that he was in the habit of using the most opprobrious and insulting language towards her, and of cursing, and abusing her in the most blasphemous manner. These matters, though not of themselves sufficient to constitute cruelty, are very proper to be received in aggravation of an act of cruelty. An act even strictly of legal cruelty, might be committed under the influence of passion, for which the offender might be sorry immediately after, and be willing to make any reparation in his power. But when cruelty is found in connection with a uniform course of brutal, unkind treatment, accompanied with the most abusive and insulting language, a case is fully made out, justifying the interposition of the court.

The proof shows that the wife was kind, dutiful and obedient; nor does the proof adduced by the husband impair the force of the proof made by the wife. It is negative in its character, and although in cases of this kind, this may be the only proof in the power of the party, to outweigh the positive proof on the other side, it must appear that from the opportunity of the witness, and his means of knowledge, the fact could not well have happened without his knowing it. The testimony of Harraway, and Arnett, cannot outweigh, or

Moyler v. Moyler.

even cast suspicion on the testimony of Campbell, as they were boarders merely, and did not lodge in the house, consequently were there only at their meals. But Campbell being a lodger, as well as a boarder in the family, had ample opportunities of knowing the manner in which the defendant treated his wife.

The declarations of the wife, as to the cause of her leaving her husband, are certainly entitled to some consideration. Indeed her declaration in relation to an act of violence, made shortly after it happened, would probably be evidence for her, and of necessity it must be evidence against her. But we think great allowance must be made in such cases, as it is not to be wondered at, that a wife about to separate from her husband, should desire to keep from the gaze of the world such mortifying disclosures, although after the lapse of years she might be anxious to vindicate herself, by making the same facts public. It appears that she told one of the witnesses, to whom she communicated the fact, that she was about to leave her husband, that she would rather die than leave him, but that she was compelled to do so ; and to another, that she was about to separate from him, because she was unwilling to raise a large family in indigence. The first seems to be creditable alike to her head and heart, and the last may be strictly true, without any impeachment of the integrity of this application. A woman who might be willing to struggle with poverty, when cheered on in the performance of her duties by kindness, and affection, might be wholly unable to the performance of the task, when accompanied by cruelty and unkindness.

We understand the chancellor as holding, that the charge of cruelty was made out by the proof, if the testimony of one witness was sufficient to establish it, but he considered that the denial of the facts alledged, by the defendant in his answer, must, as in other chancery cases, be countervailed by the testimony of two witnesses, or of one with corroborating circumstances.

In ordinary chancery suits, the rule here spoken of, does not apply where the defendant, although he deny the allegation, is not personally cognizant of it; nor does it apply when the answer is not sworn to. But in these cases, it is

evident the legislature did not intend the answer should be evidence, either for the husband or wife, as the defendant is not required to swear to the answer, and proof is required of the allegations of the bill. [Clay's Dig. 170, § 6.] A subsequent section declares, that the confession of neither shall be taken or received in evidence. [Ib. 171, § 16.] It is evident therefore, that these cases do not stand upon the same footing with ordinary chancery causes, as it repects this question, and the reason failing, the rule must fall with it.

Perhaps the answer may be necessary as pleading, where the defendant relies on a condonation of the offence, or sets up the misconduct of the other party, or any other substantive matter, in opposition to the divorce sought. Be this as it may, it is clear the answer was not intended to be evidence for any purpose, and it follows, that as an admission of the facts alledged in the bill, would not dispense with proof of them, a denial can have no other effect, than a mere traverse. The principal allegation of cruelty is fully made out by the testimony of one witness, and corroborated by proof of other acts of harsh, and unkind treatment, commencing soon after the marriage, and continuing during the entire cohabitation. If it were necessary, it might also be worthy of consideration, whether the long separation of these parties, extinguishing the last spark of affection, and rendering the prospect of a re-union gloomy and comfortless, should not also be considered in the formation of a judgment; but we abstain from entering on that inquiry, because in our opinion, the case is fully made out under the statute, independent of it, and that the complainant is entitled to the decree she seeks. The decree of the chancellor must be reversed, and this court proceeding to render such decree, as should have been rendered, hereby order, adjudge and decree, that the complainant be divorced from the bonds of matrimony heretofore existing between her, and James W. P. Moyler, her husband.