# GOODRICH *vs.* GOODRICH.

[BILL IN EQUITY FOR DIVORCE, ON GROUND OF CRUELTY, AND FOR GENERAL RELIEF.]

1. *Divorce; when will be granted on slight indications of peril to wife.*—The christian interpretation of the contract of marriage requires that the husband shall love the wife ; that "he shall delight in her as in himself," and when the proofs show that he habitually fails to do this, the courts, upon very slight indications of peril to her of body or health, will interpose for her protection, by divorce.

2. *Same ; what sufficient evidence of cruelty to justify.*—If the conduct of the husband is shown to be habitually cold, indifferent, rude, harsh, vulgar, obscene, and profane, towards the wife, and she is seen shortly after being with him, in the privity of the marital relation, in tears, with bruises on her face, lips, and side, of a serious character, and the husband admits, when complained of, that these indications of bad treatment were produced by him, his explanation that they were given in playfulness and jest, and not in anger or in earnest, will not be sufficient to rescue his "conduct" from the construction that these appearances are evidences of legal cruelty, sufficient to justify a divorce in favor of the wife for that cause.

3. *Children, custody of ; when should be granted to the mother.*—Upon a dissolution of marriage, by divorce in favor of the wife, if she has possession of the children of the marriage, who are of tender years, two being girls and the other a boy, and it appears that the mother is a woman of polite education, and of an amiable disposition, and virtuous, and if it appears that the father is habitually rude, profane, vulgar, obscene and hypocritical in his conduct, and insulting in his language to females in his household, with some evidences of a tendency to drunkenness, cold and indifferent to his children, and disposed to sell them to their grand-mother "for cash," and denounces them as "damn nasty babies" of whom he is tired—in such a case the children will not be separated, or taken from the care and tuition of the mother.

4. *Dwelling-house, &c.; when wife will be protected in possession of, by injunction.*—If during marriage, the husband conveys or causes to be conveyed to the wife, by deed, a house and lot, in which they then are residing, for the purpose of securing it from confiscation on account of the husband's participation in rebellion, and he received and holds possession of the deed for her, and if he is insolvent or likely to become insolvent, and has received moneys or estate belonging to the wife, as her separate property, of considerable value, under the laws of this State for the protection of married women, upon a dissolution of the marriage by divorce in the wife's favor, she will be protected in her

possession of such house and lot, and the furniture therein, by injunction against the husband's claim.

5. *Deposition, suppression of; when will not be allowed, unless adverse party shows actual injury.*—The suppression of a deposition, on motion of the adverse party, because the witness had been furnished with a copy of the interrogatories, and cross-interrogatories, before the examination by the commissioner, will not be allowed, unless the party complaining shows actual injury to him by such practice. In such a case error will not be presumed.

6. *Same; English orders and rules of practice; how regarded.*—The English orders and rules of chancery practice, in such cases, are not to be regarded as peremptory, but only "as furnishing proper analogies to regulate the practice" in our courts.—Chancery Rule 7, Revised Code, p. 824.

7. *Deposition, suppression of; when failure or refusal of witness to answer interrogatories will not be cause for.*—The refusal or failure of a witness to answer a question, addressed to her on an examination before the commissioner, will not be held a sufficient reason to suppress such deposition on motion of the adverse party, when it appears that the interrogatory is sufficiently answered in another portion of the deposition, or that the answer would be immaterial on the trial on the merits of the cause.

8. *Decree in chancery; when improper ruling as to parts of interrogatories, &c., will not reverse.*—When there are numerous objections to parts of interrogatories, some of which may have been improperly decided in the court below, a decree in chancery will not be reversed, if it appears that there is sufficient testimony, beside that objected to, to sustain the chancellor's decree.

APPEAL from Chancery Court of Dallas.
Heard before Hon. J. Q. LOOMIS.

The opinion sufficiently states the facts.

ALEX. WHITE, for appellant.
MORGAN & LAPSLEY, *contra.*

PETERS, J.—This suit is a bill in chancery by Mary W. Goodrich, complainant, against Rosamond C. Goodrich, defendant. It was filed in the chancery court of Dallas county, on the 1st day of March, 1867, for a divorce, dissolving the bonds of matrimony between the parties in favor of the wife, on the ground of cruelty, and prayed an injunction restraining the defendant from interfering with the control and custody of the children of the marriage, and to prevent the defendant from removing the furniture

from the house in which the complainant resided, and from all interference with complainant by personal constraint or violence, and a decree to require him to account with her for the *corpus* of her separate estate, which had been received by him during the marriage, and for general relief.

As is required in injunction suits, the statements of the bill are sworn to by the complainant, and the defendant is required to answer, without verifying his answer by his oath.— Rev. Code, § 3328.

The defendant, at first, suffered the bill to be taken as confessed, but afterwards, he appeared and had the decree *pro confesso* set aside, and filed an answer. In this answer, besides a general denial of the acts charged against him, as constituting cruelty, he sets up as a plea of condonation, that the acts complained of were "of ancient date."

The bill shows that the marriage took place on the 22d day of August, 1860, and that the parties had lived together for a little more than six years and six months. Besides the general bad conduct of the defendant by unmerited abuse and insult to the wife, which seems to have prevailed during almost the whole term of their married life, the bill alleges that the defendant had, upon several occasions, stricken complainant on the face, and in the mouth, and had once kicked her in the side, with his booted foot, with such violence as to produce a serious bruise, which remained visible for two months after the kick was inflicted, and which so affected the health of the wife that she was forced to take frequent potions of laudanum, in order to obviate the effects of a premature birth.

On the hearing, the chancellor granted a decree divorcing the wife, and made the injunction perpetual, which had been previously allowed, in reference to the custody of the children, and certain property mentioned in the bill, as being in possession of the wife at the time when the bill was filed ; the defendant was also taxed with all the costs. From this decree the defendant appeals to this court.

Marriage is admitted to be founded on agreement between the parties, and in some form it is a social necessity ; even the beasts and the birds, under its influence, "pair

off" by mutual consent, and are, usually, while the relation lasts, governed by its high and delicate solicitudes. With them the matrimonial life is one of the most°diligent assistance, and tender and affectionate regards. If they enjoy any feelings that may be called sacred,. they spring out of this great relation.

As we ascend higher in the scale of animal organization, and contemplate our own race, we find that marriage has, more or less, connected itself with the sacred rites of the people of all nations. Some have even thought that its influence does not terminate with life, and that it is indispensable for happiness in the life to come.

This important contract is acknowledged in all christian countries, to impose upon the parties to it something beyond the mere obedience of the wife towards the husband, and mere protection and maintenance on the part of the husband towards the wife. It is undoubtedly a contract at common law.—*Campbell's Heirs v. Gullatt and Wife*, 43 Ala. 57. It has been said, by the highest authority, that christianity is a part of the common law.—*Ormishund v. Barker*, Will's Rep. 538 ; 8 John. 291 ; 5 Binn. 555. Yet, although this may not be the law of this State to the same extent that it has been declared in England, it certainly enters, in no small degree, into the ascertainment of social duties, when the statute law is silent on the subject. It must also be granted, that whatever is irreligious, in most instances, is wrong, and in many it is illegal.—2 How. U. S. Rep. 127, *et seq.*

The law requires that the wife shall obey all the just and reasonable marital commands of the husband, and it requires that the husband shall protect and maintain the wife, according to his station in life ; that is, according to his means. It also refuses to sanction any "conduct," on the part of the husband, beyond what may be necessary to accomplish these important ends. But christianity goes much further. It requires that the husband shall love the wife ; that he "shall delight in her as in himself." *Itaque et vos singuli, suam quisque uxorem, ita diligeto, ut se ipsum; uxor antum videto, ut revereatur virum.—Pauli's Epist. ad Eph.* chap. 5, v. 33, Beza's Translation, New Testament, 2d

revision, p. 371, at bottom. And the great apostle gives the most conclusive reason for this injunction. He says: "He that loves his wife, loves himself. For no man ever hated his own flesh; but nourishes and cherishes it."— New Testament, *ut supra*. The law does not attempt to enforce this important rule, but it so far recognizes the necessity of its spirit, as to feel that the wife is safe so long as she is under its protection; but when this shield of her security is withdrawn, then her peril begins. The law, equally with nature, clothes the husband with the highest and most ample authority to protect the wife. He may slay in her defense, as for himself.—3 Wash. C. C. 515. And so long as he loves her, or—in the language of religion—so long as he "delights in her as himself," all experience shows that he will protect her. But when the husband's love no longer exists, then the wife's protection becomes uncertain. When this uncertainty grows so great that the wife is evidently imperiled and made unhappy to such a degree as to effect her health, and interfere with the discharge of her duties as a mother, then the courts will interpose for her protection.

A marriage may therefore be legal, though there is no love, in the apostle's sense, on either side. Nevertheless, it may be doubtful whether it may be said to be a christian marriage, in the absence of this important element. Hence, all christian marriages may reasonably be presumed to have had this important ingredient, as one of the inducements which led to its consummation. To hold otherwise, would be to insinuate that the christian, in this great relation, would belie his faith and creed.

Archbishop Rutherford, one of the most able and eminent of the commentators on Grotius, has placed marriage among the natural rights of men. He defines it in these words: "Marriage is a contract between a man and woman, in which, by their mutual consent, each acquires a right in the person of the other, for the purpose of *their mutual happiness* and for *the production and education of children*. Little, I suppose, need be said in support of this definition, as nothing is affirmed in it, but what all writers upon natural law seem to agree in."—Ruthf. Insts. of Nat.

Goodrich v. Goodrich.

Law, p. 162 ; 1 Bish. on Mar. and Div. § 3, 29 ; 2 Kent, 74, 75 ; 6 Bac. Abr. Bouv. p. 454 ; 2 Bouv. Law Dict. 12th ed. p. 105.

Mr. Parsons, referring to the same subject, in a late work of the highest authority, uses like language. He declares that "the relation of marriage is founded on the will of God, and the nature of man ; and it is the foundation of all moral improvement, and all true happiness. No legal topic surpasses this in importance ; and some of the questions which it suggests are of great difficulty."—2 Pars. on Contr. p. 74.

The law of this State declares that the purpose of this great contract has failed when the husband treats the wife with cruelty, and it allows a divorce in her favor, "when the husband has committed actual violence on her person, attended with danger to life or health ; or when, *from his conduct*, there is reasonable apprehension of such violence. Rev. Code, § 2353.

Here the proofs show, most clearly, that the husband did not love his wife ; that he did not delight in her as in himself. She complained of a gross insult offered her, by him, on the bridal trip to New York, in the first month after the marriage. To strangers he was of genteel and pleasing address ; with his wife and children he was "indifferent, cold, harsh, fault-finding and unpleasant," and he repelled their demonstrations of affection. He habitually addressed her, at home among her own family, as "a damned fool," "a damned liar," and "a damned lazy woman." He obscenely told her that she always went *backwards* when she attempted to do any thing about the household ; he ridiculed and scoffed at her dress and appearance, and said she was "sloomy," and looked like an "Irish biddy ;" he told her he would see her "damned and in hell," or "dead and damned," before he would grant her a trifling and customary favor, almost always allowed to ladies in her station in life ; he threatened to abandon sleeping in the same bed-chamber with her, because he was *tired* of her "damned nasty babies ;" and, in the presence of other females, he indecently told her "to kiss unmentionable parts of his body." And, in the end, he proposed to leave her, and

go away and never return, if her mother, a widowed lady, whose fortune had been ruined by the late rebellion, would pay him a certain sum of money "in cash." These are but portions of the enormity that complainant was called to bear of this character, and they are facts in the husband's *conduct*, during the six years of his wedded life, about which there is no plausible contradiction in the evidence, and to the proof of which there can be no sufficient objection. It is true, that these acts of extreme vulgarity and rudeness, alone, would not justify a divorce in favor of the wife, though they might wholly undermine her peace of mind and health; but they show the *animus* of the husband, and afford the court a measure by which to estimate the import of other acts of a more violent character. For this purpose they are legitimate.—*Elmes v. Elmes*, 9 Barr, 166. It is true that the husband pretends, in his answer, that these exhibitions of extreme incivility to his wife were extorted from him by her high and peevish temper. But this, were it so, is neither an excuse nor a justification for them.—*King v. King*, 28 Ala. 315. But the testimony does not sustain this pretension. The wife is shown to have been an amiable and well educated woman, and the defendant admits that her virtue was above suspicion; and he shows no justifiable reason, whatever, for his abusive conduct towards her.

But going beyond this ill-treatment, by insulting language, there must be some evidence of bodily ill-treatment or an actual and serious apprehension of it.—*Bryant v. Bryant*, 34 Ala. 516, 519; *Smedley v. Smedley*, 30 Ala. 714. It appears from the testimony of Mrs. Norris, the mother of the complainant, who is shown to be a lady of superior intelligence and the highest credit, that she lived with her daughter for several years after her marriage with the defendant, and during this time the complainant frequently appeared with serious injuries upon her person. Once her cheek was wounded, once her lips were bruised and bleeding, and once there was a contusion on her side, which was swollen and discolored with coagulated blood, and remained sore for above two months, just before the birth of one of complainant's children; and when she chided the defend-

ant as the author of these injuries, he admitted them, but insisted in explanation that they had been accidentally or playfully inflicted. He also promised reform and amendment; but the reform and amendment never came. This testimony of Mrs. Norris is fully corroborated by that of several other witnesses, who, at various times, resided in the same habitation with the complainant and the defendant. I, therefore, think that the chancellor did not commit any error in decreeing a divorce in favor of the complainant in the court below. The ground alleged in the bill was sufficient and amply proved.—*Moyler v. Moyler,* 11 Ala. 620; *Hughes v. Hughes,* 19 Ala. 307; 30 Ala. 714; *Reese v. Reese,* 23 Ala. 755.

As a general principle, upon the separation of the husband and wife, the father is entitled to the custody and control of the minor children, because he is bound for their maintenance and support.—*Ex parte Boaz,* 31 Ala. R. 425. But upon a divorce, the court may decree the custody of the children to either party.—Rev. Code, §§ 2367, 2397. The provision of the Code upon this subject is in these words : "Upon granting a divorce, the court may give the custody and education of the children to either father or mother, as may seem right and proper; having regard to the moral character and prudence of the parents, the age and sex of the children ; and pending the suit, may make such orders in respect to the custody of the children as their safety and well-being may require."—Revised Code, § 2367.

It appears that the parties to this ill-starred marriage had three children—one boy and two girls. The oldest, the boy, was six years old in June, 1867, and the youngest was fourteen months old when the bill was filed, on the first of March, 1867, and the other was four years old in July, 1867. The two younger children were too infantile to bear separation from the mother. Their very tender years still needed the ceaseless and delicate attentions of a mother's love. No one else could fill her place, without more or less of jeopardy to the safety and well-being of these little ones. As they had but one brother to whom they would have to look, in future life, for manly guidance and protec-

tion, it was improper to separate them, short of the strongest reason for such a course. This reason is not shown in the proofs.

It appears that there were twenty-nine witnesses, whose evidence was put in upon the hearing for the complainant. Some twenty or more of these speak of the character of the complainant, her education and conduct. Many of these knew her intimately, from early childhood to the filing of the bill in this case; and they testify, without exception, that she was well and politely educated in the best schools of the country, that she was lady-like in her conduct and amiable in her disposition, and that her attention to her children was tender, diligent and affectionate, and that she nursed them with untiring care and assiduity when sick, even at the peril of her own health.

On the other hand, the character and conduct of the father, at home, is shown to be cold and indifferent to his children; he spoke of them as " damned dirty babies," who so much annoyed him as to threaten to drive him from his customary bed in his wife's sleeping apartment. He refused or failed to aid his wife in nursing them, when they were complaining; and when the older little girl was very unwell, and supposed to be in danger of death, the only consolation he had to offer to her mother, who expressed her fears of the child's extreme danger, was, that " if the child died, let her die ;" he would have her " decently buried." He is also shown to be a father, at home among his family, much given to obscene, rude and profane language, and inclined to drunkenness, after the filing of the bill in this case.—*Bryan v. Bryan, supra.*

Under such a state of facts, the chancellor acted very properly in decreeing the control and education of the children to the mother, and restraining the father, by injunction, from interfering with her in the discharge of her duties towards them in this particular.

One other question, arising upon the merits of this cause, remains to be disposed of. It is the title to the house and lot conveyed to the wife during the late rebellion, and the furniture which was in the house at the filing of the bill in this case.

The proof shows that there was an actual conveyance of the house and lot, in the city of Selma, by deed, made by Mrs. Norris to the complainant in the year 1863. This conveyance was made at the request of the husband, and by his express direction. This seems to have been done in the presence of the wife, and by her consent. And when the deed was finished, it was proposed by the maker of the deed, in the presence of the husband, to put it into the keeping of the wife, but she directed to have it given to the husband, as the witness says, to hold for the wife. The husband so took charge of it, to hold for the complainant. This undoubtedly conveyed the legal title to her.—17 Ala. R. 89; *Goree v. Walthall, Adm'r*, January term, 1870.

Notwithstanding this, the defendant contends that he paid the whole purchase-money for the lands thus conveyed to the wife, out of his own funds; and explains that the deed was made to complainant, in order to avoid the loss of the lands by confiscation by the government, by reason of the husband's treason, during the late rebellion. There is not any sufficient proof of this purpose, or that the complainant received the conveyance under any agreement or understanding to hold the land thus conveyed in trust for the husband. A husband may make a valid gift to his wife, during coverture, out of his own property, and it vests a good title in her, both at law and in equity.—*Goree v. Walthall, Adm'r*, January term, 1870. Besides, the defendant does not come into this court with clean hands. Upon his own explanation, his conduct was not untinctured with a purpose of fraud against the government. He admits that he had committed treason against his country, and then he plots to defeat the government of the right that might and did arise, under this treason, to his lands. It would be an approval of such conduct to give the defendant the aid he seeks. But the proofs do not show any thing more than a simple gift to the wife. The proofs wholly fail to show a conveyance upon trust or condition for the husband's use. It must, therefore, stand as it appears; as a conveyance of the absolute estate to the wife. It also appears that the husband had received a much

larger amount of the wife's separate property than the value of the furniture. The decree of the chancellor on this question is, therefore, also free from error.—*Marsh v. Marsh*, 43 Ala.

The motion to suppress the depositions of Mrs. Norris, Mrs. Parkman, James E. Caldwell, and others, was made upon the grounds that the witnesses had been furnished with copies of the interrogatories and cross-interrogatories before they were called upon to be examined by the commissioner, and they had examined them, and had, some of them, prepared their answers and written down their depositions before they were called before the commissioner to testify. The proofs show that copies of the interrogatories and cross-interrogatories were furnished the witnesses before they were examined by the commissioner, and that Caldwell had prepared a written "memorandum" to which he frequently referred while answering. but the commissioner could not state whether it was a full answer or answers or not. This motion is made upon the respondent's construction of one of Lord Clarendon's orders, directing the manner that the examiner shall proceed to take deposition, in the English courts of chancery.—2 Dard. Ch. Pr. p. 1061; Gres. Eq. Ev. p. 53; *Shaw v. Lindsey*, 15 Vt. 381, marg.; 3 Greenl. Ev. § 324.

This objection, so far as I know, is novel in our courts. Undoubtedly, by the practice in this State, the complainant may show a witness a copy of the interrogatories upon which he intends to call upon him to be examined. He would be entitled to a copy of the interrogatories filed by the opposite party, and having such copy, there is no reason why it may not be shown to his witness.—Rev. Code, p. 830, rule 49. If this may be allowed without injury in reference to the interrogatories in chief, then it seems that for a like reason the same practice might be applied to the cross-interrogatories. *Ubi eadem ratio, ibi idem lex.*—7 Coke, 18; Broom's Max. p. 64. The orders above referred to, as fixing the practice of the English courts of chancery in like cases, have never been adopted as positive rules by our courts or by statute, but they may be looked to "as furnishing proper analogies to regulate the practice."—Re-

vised Code, p. 824, rule 7. It must, therefore, be shown that injury has accrued from the practice here complained of, before a deposition will be suppressed for this reason. And no such injury is shown in this case, or pretended. The English rules and orders above referred to are, at best, but guides to aid the discretion of the court, and they will not be enforced, unless it shall be made to appear that the court has injuriously exercised its discretion. The other portion of the objection is not sustained by the proof. A witness may use a memorandum to refresh his memory, under the discretion of the court, when he needs it.—Phill. Ev. p. 419, Notes by C. & H., part 1, p. 441, note 273.

The chancellor did not err in overruling these objections.

There is also another series of motions to suppress these depositions, or a portion of them, on other grounds, which were overruled by the chancellor, and which are insisted on as error. The objection is, that certain of the cross-interrogatories were not answered, or evasively answered. This objection seems to be rather technical than substantive. One or two instances of the grounds of these objections may serve as a fair sample of all the rest. Mrs. Norris was asked, " whether she did not, or had not talked over with the other witnesses what they would *swear* in in this case." She answered, that she " had talked with them about the matter." She was again asked whether she had not, in a certain locality and during certain years, spoken " in high praise and commendation of the defendant;" she answered, " I spoke well of respondent whenever my friends would speak of his conduct. I think I may have so spoken of him in the years mentioned."

It is contended that this answer was evasive, because the witness does not disclose whether she spoke " in high praise and commendation" of defendant or not, at the place and time referred to. This would almost appear like trifling, in so serious and painful a litigation, did not the very great ability and admitted eminence of the learned counsel, who have so liberally indulged in this sort of practice, in this case, altogether forbid such a conclusion. A deposition will not be suppressed on account of a failure to an-

swer a question, if the facts sought to be elicited can be ascertained from other parts of the deposition, or are immaterial.—*Black v. Black*, 38 Ala. 111 ; *Spence v. Mitchell*, 9 Ala. 744 ; *Buckley v. Cunningham*, 34 Ala. 69 ; *Gibson v. Goldthwaite*, 7 Ala. 281 ; *Aicardi v. Strange, Murray & Co.*, 38 Ala. 226.

Here the facts sought to be elicited by the questions supposed to be evasively answered, or answered insufficiently, or not at all, are wholly immaterial, upon the merits of the case. No responsive answer that could have been given to them would alter the determination of the case. They, almost without exception, intended to impeach the testimony of Mrs. Norris and other witnesses, who confess a leaning to the complainant in this suit. But the character of Mrs. Norris and the other witnesses, who concur with her in her statements, in reference to the defendant's cruel and shameful conduct towards his wife, almost during the whole term of his married life, leaves no doubt in my mind of her truthfulness, and of his guilt.

The other objections to specific questions and to certain other portions of the evidence, need not be examined in this opinion. If they were all sustained it would not alter the judgment of the court. There is abundant testimony besides the matters thus objected to, to sustain the decree of the chancellor below.

It may be proper to add, that the proofs show that the defendant was a person of polite address, when abroad from his own family ; moral in his deportment, and of good business habits, and that he furnished his wife with enough to eat of suitable quality of provisions, except on one occasion, when he refused or failed to provide her the means for a dinner, which her mother supplied for her ; and he also afforded her a sufficiency of suitable, handsome and costly wearing apparel. But this seems to have been done as much for his own gratification as to render the complainant comfortable and happy. Yet to a refined and educated woman, accustomed to be caressed and admired, as ladies in her station in society usually are, what are baubles such as these in comparison to the love and sympathy of her husband? They are as nothing! The chain

that binds a wife and mother to unmerited insult, blows and degradation, before her friends and family, is not the less galling and insupportable, because it is woven of gold and decorated with silks and gems.

Let the decree of the chancellor in the court below be in all things affirmed, and the appellant, Rosamond C. Goodrich, will pay all the costs in this court and in the court below.