KATE WILLIAMS, PLAINTIFF IN ERROR, v. EDWARD L.
   WILLIAMS and ELIZABETH M. WILLIAMS, DEFENDANTS
   IN ERROR.

1. DIVORCE FOR EXTREME CRUELTY.—To constitute the extreme cruelty
   which, under the statute, authorizes a decree of divorce on the com-
   plaint of a wife against a husband, there must have been either
   actual violence committed by the husband, attended with danger
   to life, limb or health, or there must be reasonable apprehension
   of such violence.  A solitary instance of cruelty, not of the danger-
   ous and violent kind, ought not to be held to bring a case within
   this provision of the statute.
2. ORDERING NONSUIT FOR WANT OF EVIDENCE.—Where the wife's
   complaint for divorce is based on the statutory ground of extreme
   cruelty, and the evidence in her favor shows no actual violence
   which can be reasonably supposed to have endangered either the
   life, limb, or health of the plaintiff, it is the duty of the court to
   grant a nonsuit, its power to take the case from the jury being the
   same as in other cases.  Whenever there is such a failure of proof
   that if a verdict was returned in favor of the plaintiff the court
   would be compelled to set it aside as being unsupported by evi-
   dence, a nonsuit should be ordered.

*Error to District Court of Arapahoe County.*

Messrs. LIPSCOMB & HODGES, for plaintiff in error.

Messrs. MORRISON & KOHN, for defendants in error.

BISSELL, J.  This proceeding by Mrs. Williams, the
plaintiff in error, to obtain a divorce from her husband, is
rested on the statutory ground of extreme cruelty.  The
parties intermarried in July, 1888.  They came to Denver
in August, 1889, and this suit was brought on the 23d day
of November of that year.  The bill contains much irrele-
vant matter relating to the married life of the parties prior
to their coming to the state, though no acts of cruelty are
charged save what were committed subsequent to that time.
These allegations of the complaint, and the testimony offered

thereunder, will be referred to to show the status of the parties and the sort of relation which they sustained to each other. They were evidently introduced into the pleading, and the proof offered, to support the contention that the threats of separation charged to have been repeatedly made in Denver were a part of a deliberately preconceived plan which had its culmination in the proceedings in Colorado, and amounted, when coupled with the physical abuse, to that extreme cruelty which the law deems necessary to a divorce on this ground. The married life of Mr. and Mrs. Williams for the year following their union was both harmonious and anomalous. This period substantially covered all their married life prior to their coming to Colorado. According to the testimony of Mrs. Williams, that year was unmarred by any act of conjugal infelicity. It was only shadowed by the dual life led by the husband, who was a husband to her and a single man to his family. He did not live with her, but visited her by day, and slept at his mother's house. The wife neither visited the family, knew them, nor was known by them during all this time, but was seemingly content to maintain such relations during the pleasure of the husband. It does not transpire what disturbed this apparently satisfactory condition of affairs. On Saturday the wife went to his house to learn the cause of his absence. This was the first occasion of a visit to the husband's and mother's home. It was followed by a visit to the wife's rooms on Sunday by the husband, and a brother-in-law. This intrusion is chiefly characterized by the suggestion of a divorce by the brother-in-law. The result was an appointment to visit the mother-in-law. According to the wife's story, she is welcomed into the house about ten, left alone till one, and then invited to dinner, where she is politely asked if she wouldn't like to go to Denver. Up to this time there is neither violence nor quarrel. She is invited to remain over night and permitted to sleep with a sister-in-law, while the husband slept elsewhere. The wife neither protests nor objects. The plan of going to Denver is fully dis-

cussed, agreed to and determined on. She did not protest when introduced by the mother-in-law during her stay as Miss Lent. There is nothing tending to show that her consent was procured by fraud or by intimidation;—a woman of years, twenty-nine, and not without experience, does not assent to such schemes for such reasons. The situation neither abashed nor angered her. Whatever was proposed met her ready acquiescence. The righteous indignation which might justly have filled her soul, and overflowed to the consternation of her husband and his family was not aroused. In pursuance of the plan then and thus determined on Mrs. Williams returned to her rooms, visited her father on Tuesday, and on Wednesday started West. This history demonstrates that prior to August, 1889, there was no extreme cruelty, and that in the past there is nothing which, if admissible, would tend to support the charge, and that it must rest in fact as well as in law on what occurred in Denver.

In stating the proof of the charge the wife's statements will be accepted, though much of it is met by the husband's denial. Very much of what will be narrated neither comes within the legal definition of extreme cruelty, nor adds to the force of the two instances of physical abuse which the wife's testimony supports, but it is given to show the entire case which the court refused to permit to go to the jury. The first suggestion of a quarrel occurred shortly after their arrival at the Windsor, in Denver, and sprung up on a suggestion from Mr. Williams that his wife go to Nevada, to her sister's. Her refusal begot anger and he threatened to go out and " paint the town red," and the disagreement resulted in his going out and coming home drunk. On several occasions he renewed his requests for her to go to her sister's, sometimes as a suggestion of his own, and again as a necessity because his mother insisted on it. There was no other sort of abuse or indignity shown the wife, save during a quarrel in their California street home, when he took her " by the throat" and choked her. Their version of this occurrence

differs slightly ; —according to her story he caught her by the throat and choked her, and according to his, while they were quarreling she kicked and he shoved her by the neck into a chair gently.   On another occasion, during an altercation over what the mother had written to the effect that she ought to go to her sister's, the wife insists that he slapped her, which assertion he wholly denies.

The record will be searched in vain for proof of any other physical abuse, or physical cruelty.   It is equally barren of all other evidence of that refined cruelty, which is sharper than the knife, and more brutal than the fist.   After coming to the state, the husband seemed to be spurred on by his mother to compel his wife to leave him and go to Nevada. The object is not very apparent, but must have been to lay the foundation for a legal separation, which would be otherwise impossible.   It was a purpose, if such it may be called, not always present and by no means continuous.   As man and wife, to the world they lived in apparent harmony. Their quarrels were neither public nor bitter.   They only happened when a letter from the mother would arrive egging him on, and urging him to force an end to what was to the family apparently a distasteful connection.   This is evident from his declarations to his wife after his mother arrived, early in November, and steps had been taken looking to a separation.   While negotiations were actually progressing to that end, and lawyers discussing the details, Mr. Williams told his wife that he did not desire a separation, but was forced to consent to it because of his financial situation, and that he would return to her as soon as he obtained his property from his mother.   It would be an idle thing to detail what took place after his mother, Mrs. Williams, arrived in Denver.   It was a cruel, bitter, unholy persecution.   A weak, vacillating, purposeless son was controlled by a dominating woman, to the end that the tie which bound him might be severed.   The few days which covered the negotiation, and culminated in the present suit, must have been sad and distressing.   A firm stand for her absolute marital rights, and

a refusal to be a party to any proceedings which might fore-shadow a separation, would necessarily have ended the matter. The assent which the wife evidently gave, and which is expressed in her acts, deprive these matters of that force, as a part of the proof of cruelty, which is accorded to them by counsel. But assuming that to be a part of the cruelty to which she was unconsentingly subjected, and taking the case as a whole, and the inquiry is, does the plaintiff's proof establish extreme cruelty as the cases define it?

Probably there is no phrase or term known to the law of marriage and divorce which has been so frequently considered, construed and defined, and none which still remains in so much apparent obscurity. This doubtless comes from the circumstances that each case must be decided on its own facts, which in the complexity of human affairs can never resemble any other, rather than from any inherent difficulty in defining the term. The conditions under which society exists, the prevailing ideas concerning the sanctity of the marriage relation, the drift of public sentiment, and the tendency of particular communities concerning it have led courts to broaden or narrow the definition; not in terms, but by that insensible process which comes from holding that to be extreme cruelty in one case, which under slightly varying circumstances is adjudged to be not within the term in another. Though the tide of judicial definition may thus be said, in some slight degree, to rise and fall, the cases all accept *Evans v. Evans*, 1 Hag. Con. 35, (4. E. E. R. 310,) as the leading case on this branch of the law. The decision is universally accepted as an accurate exposition of the rule to be followed in this class of cases. The basis on which it rests is conceded to furnish the only unquestionable foundation on which a decree may be constructed.

The learned jurist declares that " to constitute legal cruelty there must be reasonable ground to apprehend danger to life, limb, or health." He proceeds to say: " This however must be understood, that it is the duty of courts, and consequently the inclination of courts, to keep the rule extremely strict.

The causes must be grave and weighty, and such as to show an absolute impossibility that the duties of the married life can be discharged. In a state of personal danger no duties can be discharged, for the duty of self-preservation must take place before the duties of marriage, which are secondary both in commencement and obligation. What merely wounds the mental feelings is in few cases to be admitted, where they are not accompanied with bodily injury, either actual or menaced. Mere austerity of temper, petulance of manners, rudeness of language, a want of civil attention and accommodation, even occasional sallies of passion, if they do not threaten bodily harm, do not amount to legal cruelty; they are high moral offenses in the marriage state, undoubtedly, not innocent surely in any state of life, but still they are not the cruelty against which the law can relieve. * * * In the older cases of this sort which I have had the opportunity of looking into, I have observed that the danger to life, limb, or health is usually inserted as a ground upon which the court has proceeded to a separation. This doctrine has been repeatedly applied by the court, in the cases that have been cited. The court has never been driven off this ground. It has always been jealous of the inconvenience of departing from it, and I have heard no one case cited, in which the court have granted a divorce without proof given of a *reasonable apprehension* of bodily hurt." 11 Ala. 623, *infra.*

It was also said in *Lockwood v. Lockwood*, 2 Curteis 281, " that there must be either actual violence committed, attended with danger to life, limb, or health, or there must be a reasonable apprehension of such violence. This I apprehend to be the substance of the doctrine laid down in *Evans v. Evans.*"

The whole body of the law upon this subject, when carefully examined and considered, whether in the cases which have stretched the rule by their application of it to conditions and facts which apparently do not bring the cases within its scope and purview, or in those which can be readily recognized as easily within its limits, coincides with this

ancient landmark.   When the case declares that a divorce
shall be granted because of the wilful misconduct of the
husband, it is because that wilful misconduct is adjudged to
be of the sort that endangers the life or health of the wife,
which exposes her to bodily hazard and intolerable hardship.
The offense must be bodily harm, the cruelty must be grave,
and endanger life or limb, or at any rate subject the person
to danger of great bodily harm.   It must be of a character
to be in fact intolerable, not to be borne.   Running through
all the adjudications below cited, and many others to which
reference is not made, the same definition in various and
modified forms is always given, and the cases wherein a
divorce has been granted on the ground of extreme cruelty
have always been adjudged to be within that rule as thus
announced.   *Moyler v. Moyler*, 11 Ala. 620 ; *Boor v. Boor*, 8
N. H. 307 ; *Beyer v. Beyer*, 50 Wis. 254; *Close v. Close*, 24
N. J. Eq. 338 ; *Henderson v. Henderson*, 88 Ill. 248 ; *Shaw
v. Shaw*, 17 Conn. 189; *Knight v. Knight*, 31 Iowa 451;
*Hughes v. Hughes*, 44 Ala. 698 ; *Kennedy v. Kennedy*, 73 N.
Y. 369 ; *Smedley v. Smedley*, 30 Ala. 714; *Doolittle v. Doo-
little*, 78 Iowa 692 ; *Peavey v. Peavey*, 76 Iowa 443.

Judged by this rule, there is nothing whatever in the case
to establish that cruelty on the part of the husband which
can be adjudged in the law sufficient to justify a divorce.
The case is without proof of any actual violence which can
be imagined to have endangered the life or health of the
complainant.   According to her own testimony, taken as an
entirety and as absolutely true, there never was but a single
occasion when he laid violent hands on her, and that under
the circumstances of a quarrel, and in a manner which,
though an indignity to his wife, and a breach of every rule
which ought to govern and control the relations between the
sexes, cannot be said to be of the sort which must be proven
to bring the case within the definition of extreme cruelty
under the statute.   It has been said, and we think well ad-
judged, that a solitary instance of cruelty, not of the danger-
ous and violent kind, ought not to be held to bring a case

within the law which warrants a divorce. *Hoshall v. Hoshall*, 51 Md. 72.

It is not necessary to decide whether a single act of violence, sufficient in itself to injure the life of the person upon whom it is committed, would or would not warrant a divorce, because a case of that description might contain another element, that of a reasonable apprehension of danger in the future, which, coupled with slight circumstances, might justify the court in holding that a case was made out. But where there is but a single act, wholly unattended by any elements of danger to either life or health, and it is simply an indignity of which no gentleman or well-bred person would be guilty, it must be the law that such an act, or two of them, would not make a statutory case of extreme cruelty which would entitle a party to a decree.

Taking this view of the law and of the plaintiff's rights, the court below took the case from the jury and granted a nonsuit. The action of the court in this particular is the only remaining error to be disposed of. The power of the court in this respect seems to be well settled in this and other states. It has been repeatedly adjudged that power is vested in the court to determine whether the evidence offered tends to support the allegations of the party in whose behalf it is introduced. Wherever there is such a complete failure of proof, that the court would be compelled to set aside the verdict as being unsupported by evidence, it clearly has the right to withdraw the case from the consideration of the jury. Proffatt on Jury Trials, § 351; *Behrens v. R. R. Co.*, 5 Colo. 400; *Brasher v. R. R. Co.*, 12 Colo. 384; *Savage v. Pelton et al., ante* p. 148; *Carl v. Ayers*, 53 N. Y. 14.

There can be no difference whatever, in the power of the court in the premises, in actions which are brought to sever matrimonial ties, and those which are instituted on other causes, with regard to which under the law the defendant is entitled to a jury trial. If the court has the power and ought to exercise it in the one class of cases, the same right and the same duty must exist in the other. The question is

simply whether or not the plaintiff has made a case which the court would sustain by the entry of judgment, should the jury find a verdict in his favor. Perceiving no error in the record which warrants a reversal the judgment is affirmed.

*Affirmed.*