COBB, Chief Justice.
On October 8, 2008, this Court granted the petition for a writ of certiorari filed by-David G. Clark to review the no-opinion affirmance by the Court of Civil Appeals of the trial court’s final order in this divorce case. Clark v. Clark (No. 2070264, June 27, 2008), — So.3d - (Ala.Civ.App.2008) (table). The trial court’s judgment of divorce awarded sole physical custody of the parties’ minor daughter to Michelle C. Clark, the mother; divided the marital property; and ordered David G. Clark, the father, to pay child support and periodic alimony. For the reasons stated herein, we reverse and remand the case for further proceedings consistent with this opinion.

A. Facts

I. The Parties

The father and the mother married on March 16, 1991. The daughter was born on September 9, 1998; the parties have no other children. On June 30, 2006, the father filed a complaint in the Baldwin Circuit Court seeking a divorce and custody of the daughter. On August 3, 2006, the mother filed an answer and a counterclaim for divorce and seeking custody of the daughter. The ease was tried on June 11-12 and August 9-11, 2007.[1]
Generally, the witnesses who testified at trial, including Dr. Alice Frederick, the parties’ marriage counselor, described the father as a “rational,” “stable,” and “responsible” man who was an appropriate role model for the daughter and who could provide appropriate parental guidance and discipline. Although Dr. Frederick was not asked her opinion as to whether it would be appropriate to place the daughter in the physical custody of the mother, Dr. Frederick testified as follows regarding the possibility of the daughter’s being placed in the primary physical custody of the father:
“[Father’s counsel]: Hypothetically speaking, if [the father] were to be awarded primary residential custody of [the daughter] do you have an opinion whether [she] would grow up in a nurturing environment that was safe, secure, stable, progressive ... ?
[[Image here]]
“[Dr. Alice Frederick]: Yes. [The father] is a very stable and a very involved father and would do whatever he thought was in [the daughter]’s best interests.
“[Father’s counsel]: Would it in fact please you to see [the daughter] grow up under [the father’s primary residential care? ... I’m not asking you to choose one over the other. I was just asking you.
“[Dr. Alice Frederick]: Yes, I would like to see [the father] — I would like to see [the daughter] with [the father], [The daughter] reacts well with to [the father] and is very calm with [the father].”
The mother and her mother, the daughter’s maternal grandmother, testified, however, that the father was “cold and calculating” and that he would “push [the mother’s] buttons” — implying that he would deliberately cause the mother to lose her temper.
The father is a general manager for a hotel on the Gulf Coast. His work schedule is flexible, but at times requires him to work more than eight hours during a day and at night and on weekends. The mother is a partner in an antique business. *1110 When the daughter is in her custody, the mother is able to take the daughter with her to work and to have her come to the antique shop after school.
The evidence before the trial court indicated that the mother was a person who had difficulty controlling her anger. Patricia Babb and the mother both described their relationship as “best friends.” Babb, who had known the mother for 19 years, testified that the mother was prone to outbursts and fits of rage and that those fits of rage had grown more frequent in the “last couple of years” before the trial. Babb stated that she had recommended to the mother several times over the years, and more frequently in the year leading up to the trial, that the mother seek therapy to learn how to manage her anger. According to Babb, the mother did not like this suggestion and would not agree she needed anger-management therapy. Babb stated that the mother was most prone to fits of anger toward her immediate family, including the father. Babb characterized the mother as a “good mother” and explained that the mother was involved in the daughter’s school activities. Babb testified that the mother disciplined the daughter at times by yelling at her. Babb expressed her concern that some of the mother’s yelling at the daughter was inappropriate. In addition, Babb testified that the mother had expressed resentment of the daughter and the attention the daughter received from the father; however, the mother denied that she had told Babb that she resented her daughter.
George Bates, who resides across the street from the parties’ marital home, described the mother as follows:
“[The mother] has a rage about her that she has an anger problem, but I have also seen a soft side of her, too. But the rage will just come right out on a dime. Um, I mean, I have always liked [the mother]. I felt sorry for her because of, I felt like she had a rage and anger problem but, um, I really — I just don’t, ah, you know, understand the anger and the rage. I, I- — because it comes out and she gets mad at the world. And I mean mad.”
The mother’s first cousin, Patricia Fa-gan, testified that she had “fairly often” seen the mother lose control of her emotions, both in private and in public. Fagan testified that on several occasions she attempted to discuss with the mother the concept of anger management and the mother’s temper but that those discussions only infuriated the mother more. Fagan testified that the mother had seemed to be a good mother up until two years before the trial, which was when she last had contact with the mother. Fagan did not know about the quality of the mother’s parenting skills since that time because the mother and Fagan had not spoken in that time. Fagan testified that the mother had “a lot of resentment since [the daughter] was born,” but she also testified that she had not seen the mother discipline the daughter inappropriately.
Chris Solberg, the wife of one of the executives at the hotel where the father worked, testified that she saw the mother lose her temper with the daughter in 2004 when some of the families of hotel employees evacuated to a motel in Prattville in anticipation of a hurricane hitting the Gulf Coast. Solberg described the incident as follows:
“[Solberg]: We all tried to go to breakfast together.... My daughter actually had gone to the restaurant with [the mother] and [the daughter] and I was coming behind them. And the hotel was full, the restaurant was full, people were — they had a buffet set up so people were coming and going. And I was putting my stuff, my things down to sit *1111 down to eat breakfast. And I noticed [the daughter] was trying to get her mother’s attention. And, um, she kept saying, ‘Mommy, Mommy.’ She was trying to tell her something. And [the mother] was very uptight at that point, and said, grabbed [the daughter] and said, ‘Shut up.’ And grabbed her and shook her and said, ‘Just shut up. Shut up. What do you want?’ And [the daughter] just was, she was devastated. She started crying. My daughter was upset.
“[Father’s counsel]: How loud did she holler?
“[Solberg]: It was loud so the entire restaurant could hear. Because later people who were sitting on the other end of the restaurant made comments to me about it.”
However, when confronted with Solberg’s account of the incident at the motel in Prattville, the mother testified that she did “not remember shaking [her] daughter ever.”
Other witnesses testified that they had seen the mother drunk in public but that they had not seen the father drunk in public. In addition, several witnesses testified that they had seen the mother in a rage at the father and had heard her at the father’s workplace in the presence of other employees loudly referring to him as “stupid” and as an “idiot” who did not know how to manage the hotel. The mother denied that those incidents occurred. She also testified that, when the father had the daughter in his custody for visitation during the separation before the divorce, he would often arrange babysitters for the daughter because of his work schedule and that he fed the daughter “an awful lot of fast food.”

II. Initial Testimony of Dr. France Frederick

On June 11, 2007, Dr. France Frederick,[2] a clinical psychologist specializing in child and family psychology, testified that she had had counseling sessions with the daughter seven times beginning November 16, 2006. At the time of Dr. France Frederick’s initial testimony, the daughter’s most recent counseling session with Dr. Frederick had been on June 4, 2007. Dr. Frederick testified that, at the outset of the therapy, the daughter “was extremely reserved and uncomfortable and very reticent to move away from her father[3] ... physically.” Dr. Frederick testified that
“[the daughter’s] extreme reserve and lack of willingness to interact with another person is not what I normally see in a kid her age. Her withdrawal and shyness and discomfort, not that it’s particularly abnormal but ... that’s not what you expect, especially when she gets comfortable how quickly she sort of changes that demeanor and goes back and forth. So that’s notable.”
However, Dr. France Frederick characterized the daughter’s progress in therapy as follows:
“My professional opinion is that she has come a very long way. Her progress is notable. Her social skills are much more adequate. She expresses her emotional experiences, her feelings much more clearly. She, um, is much more outspoken about her needs rather than *1112 being as reserved and deferring to her parents.”
Dr. France Frederick characterized both the father and the mother as “fantastic parents.” She described the daughter as “a fantastically brilliant kid,” who has no disciplinary problems in school, who makes good grades, and who “does very well in an academic structure, in the classroom, with friends, with her teacher.” However, Dr. Frederick did not think that the daughter’s excellent performance in school was an indication that the daughter would benefit by continuing in the sole physical custody of the mother with visitation by the father as had been the status quo during the parties’ separation while the divorce action was proceeding. According to Dr. Frederick, the daughter was “doing excellent in school but part of that is her obsessive nature, that she would obsessively work very, very hard to be perfect to keep the tensions low.” Dr. Frederick pointed out that her first counseling session with the daughter occurred during the school year and while the daughter was in the sole physical custody of her mother, and Dr. Frederick noted that “[t]he child I saw had serious issues when I first started therapy with her.” The mother, however, testified at trial that the daughter had no behavioral or developmental problems.
Based on research with which Dr. France Frederick was familiar, as well as her familiarity with the daughter and the Clark family’s financial situation, Dr. Frederick strongly recommended that the father and the mother share joint physical custody of the daughter, with the daughter spending equal time in the physical custody of each parent. When asked if the daughter would be better off “waking up in the same home” she had been in for the last eight years of her life, Dr. Frederick testified:
“That would absolutely go against what I just recommended so absolutely I think she should share both parents. I do not think she is a kid who would function very well with just one of her parents. I think that would be very, very hard for her.”
On cross-examination by the mother’s counsel, Dr. France Frederick was further questioned about her custody recommendation:
“[Mother’s counsel]: But [the daughter’s] access [to her parents] doesn’t have to be equal. And that’s not — equal access is really not in the best interest of the child, is it?
“[Dr. France Frederick]: In some children it is not. For [the daughter] she functions much better when she has access to both parents.
“[Mother’s counsel]: But that’s not equal access. For example, she’s functioning well now, isn’t she?
[[Image here]]
“[Dr. France Frederick]: When she is solely with her mother it is very hard for her to open her mouth and express any emotions whatsoever.
[[Image here]]
“[Mother’s counsel]: I’m not saying it solves all problems. All this is cumulative. But at this point it would not be in the child’s best interest that she be required to move from the home. Do you agree with that?”
“[Dr. France Frederick]: I’m saying it’s in her best interest to live half of the time in her mother’s home and half the time in her father’s.
[[Image here]]
“[Mother’s counsel]: Do you think it’s important for that child to have structure and routine during the school year?
*1113 “[Dr. France Frederick]: I think it’s important that she have structure and routine. I think that ....
“[Mother’s counsel]: And isn’t it true that, that child is most likely to have structure and routine if she wakes up in the same bed every morning and goes to bed in the same bed every night during the school year and while school is in session?
“[Dr. France Frederick]: I think it is most disruptive if she has severe psychopathology because she withdraws into a very strange inner world in order to not deal with being separate from one or the other of her parents.”
Dr. France Frederick further testified that the daughter would suffer adverse consequences if the court did not follow her custody recommendation. Her testimony in this regard was as follows:
“[Dr. France Frederick]: This child is easily — she has a lot of trouble. When I first saw her, she had so little permission to be with her father. And she was — she acted very, very strangely. When she is comfortable with permission to be with either parent I have a different kind of kid that I work with. And [the daughter] is very clear about what a big deal that is to her. In spite of tension between her parents that she cannot stand, she chooses to still work with me because she has said, T know you really like both of my parents.’ And she likes that negotiation. And she knows that I like both of them and think they both really care about her, despite their issues. So I think—
“[Father’s counsel]: You’re very — you are almost on the verge of being emotional about this, aren’t you?
“[Dr. France Frederick]: I’m professional about it.
“[Father’s counsel]: I understand but you are very—
“[Dr. France Frederick]: Yes. I am very adamant.
“[Father’s counsel]: — fervently committed to this recommendation; are you not?
“[Dr. France Frederick]: I wouldn’t have made it if I weren’t. Yes.
“[Father’s counsel]: All right. And do I understand that there would be adverse consequences not — in your professional opinion — not to follow your recommendation?
“[Dr. France Frederick]: Or some real close form of it?
“[Father’s counsel]: Mm-hmm.
“[Dr. France Frederick]: There will be issues. ... And I think that [the daughter] will absolutely pay that price. “[Father’s counsel]: It’s not about winning or losing in court, is it?
“[Dr. France Frederick]: If it is, [the daughter] is going to be the one that loses and I am really, really clear about this.”

III. The Trial Court’s Refusal to Permit Recall of Dr. France Frederick for Further Testimony

On July 27, 2007, several weeks after Dr. France Frederick’s initial court appearance in June, while the trial was continued, an incident occurred during a visitation exchange that caused Dr. Frederick to change her professional opinion about whether shared physical custody was in the daughter’s best interest. The incident was videotaped by a neighbor. The videotape was entered into evidence, and the mother, the father, and another witness described the incident at trial. The incident occurred when the father went to the mother’s house to pick the daughter up for scheduled visitation. He attempted to retrieve the daughter’s clothing and luggage and place them in his car while the mother *1114 screamed at him and at another man present during the incident continuously, demanding money.
Numerous times during the exchange, the daughter attempted to stand between her parents, and she held her hands up between their faces. Each time, the mother pushed the daughter’s hands out of the way and continued screaming at the father, often positioning her face in close proximity to his. The father and another man present during the incident each physically removed the daughter from the middle of the argument, but the daughter returned and again placed herself between her parents and put her hands up between their faces. The father was calm during the incident, though he clearly voiced disagreement with the mother. The mother did not allow the father to have the daughter’s clothing and luggage until the father wrote the mother a check. The trial court described the July 27, 2007, incident as follows: “[T]he [mother] admitted that she yelled.[4] And I don’t think it’s a good thing to hold the child hostage for money, but, you know, there is no doubt in my mind that’s what she did. So let’s move on and get onto something else.”
When the trial resumed in August 2007, the father sought to recall Dr. France Frederick to verify that the daughter had suffered “a relapse” as a result of the mother’s conduct during the July 27, 2007, visitation exchange. The trial court denied the father’s request to recall Dr. France Frederick on grounds that “the witness had already testified and that if the trial had not been interrupted the testimony wouldn’t have come in.” The father submitted an August 8, 2007, letter from Dr. France Frederick as an offer of proof regarding the anticipated substance of her testimony. The letter stated:
“Judge Partin, I have been working with [the daughter] since November 2006. At our last regularly scheduled session on 31 July 2007 there was a dramatic and disturbing change in [the daughter's demeanor and behavior. She behaved much the way she did in the first sessions in a manner that demonstrated severe withdrawal and lack of developmental appropriate communication. These are symptoms often seen in children with pervasive developmental disorder, or children that have been sub *1115 jected to devastation and to trauma (post-traumatic stress disorder). I was extremely concerned and alarmed. I have not seen any of these behaviors in quite some time. And this regression was alarming.
“[The daughter’s father brought her to this session. I called her father into the session to try to help [the daughter] discuss what may have occurred. I asked her father had there been any conflict in [the daughter's presence? Her father told me that the recent visitation exchange went poorly. This visitation exchange occurred on Friday, July 27, 2007, which occurred between the date of my previous testimony at the prior hearing in June and the recommencement of that hearing this week. The exchange happened on the 27th of July and I saw [the daughter] on the 31st of July.
“When [the daughter] began therapy I had a very straightforward discussion with [the father and the mother] about the dynamics of [the daughter’s psychological functioning and the presence of some disturbing symptoms that were notably exacerbated when [the daughter] was subjected to any tension between her parents, yet seemed to abate dramatically when [the daughter] felt less stressed. I emphatically warned these parents against subjecting this child to any outbursts, tension, or conflicts they may deal with between themselves. I have since implored [the mother] to refrain from this kind of behavior.
“At the time of the conclusion of [the daughter’s session I inquired about this last visitation exchange. [The father] told me that he had a videotape of the exchange. I requested to view this videotape. The behaviors to which [the mother] blatantly subjected [the daughter] are very dangerous to this child. These behaviors are exactly the behaviors and violent displays of outrage that
I explained could be devastating to [the daughter].
“I have stated [my] bias toward a joint legal and physical custodial relationship, but the safety of this child must be considered first and foremost. My professional recommendation is that [the daughter] be in the primary custody of her father ... and that parent/child exchanges be structured without any communications between parents.
“Sincerely, France Frederick, PhD. Clinical Psychologist.”

IV. The Divorce Judgment and Subsequent Appellate Proceedings

On September 4, 2007, the trial court entered an order granting the parties a divorce on the ground of incompatibility of temperament. Further, the trial court awarded the mother sole physical custody of the daughter, divided the marital property, and ordered the father to pay alimony, child support, and other related expenses. On November 13, 2007, after the parties filed posttrial motions, the trial court entered an order modifying the September 4, 2007, order in several ways, including reducing the father’s periodic-alimony obligation from $2,000 per month to $1,700 per month.
On December 26, 2007, the father filed a notice of appeal to the Court of Civil Appeals. On June 27, 2008, the Court of Civil Appeals affirmed the judgment of the trial court, without an opinion. The father then petitioned for certiorari review of the Court of Civil Appeals’ decision, and this Court granted his petition. We now turn to the merits of this appeal.

B. Analysis

I. Whether the Trial Court Erred in its Custody Determination and in Refusing to Permit Recall of Dr. France Frederick

The father argues that the trial court’s order awarding the mother sole *1116 physical custody of the daughter must be reversed because, according to the father, the trial court erred in refusing to allow Dr. France Frederick to testify regarding an incident that occurred during a continuance in the trial and after her initial testimony in the case. In addition, the father argues that the trial court’s custody determination was erroneous because it was so unsupported by the evidence as to be plainly and palpably wrong. Before we begin our analysis of the father’s arguments, we first consider the applicable standards of review.
“Alabama law gives neither parent priority in an initial custody determination. Ex parte Couch, 521 So.2d 987 (Ala.1988). The controlling consideration in such a case is the best interest of the child.” Ex parte Byars, 794 So.2d 345, 347 (Ala.2001). See also Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994) (“In an action between parents seeking an initial award of custody, the parties stand on equal footing and no presumption inures to either parent. Hall v. Hall, 571 So.2d 1176 (Ala.Civ.App.1990). The trial court’s overriding consideration is the children’s best interests and welfare. Santmier v. Santmier, 494 So.2d 95 (Ala.Civ.App.1986).”). When an appellate court reviews a trial court’s child-custody determination that was based upon evidence presented ore tenus, the trial court’s decision is presumed to be correct and will be reversed only if the evidence so fails to support the custody determination that it is plainly and palpably wrong. Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
However, a trial court’s ruling on the admission of evidence is reviewed for an excess of discretion. Mock v. Allen, 783 So.2d 828, 835 (Ala.2000). A trial judge has wide discretion in determining whether to exclude or admit evidence. Wall-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala.1998). Moreover, a trial court’s judgment will not be reversed for an error in admitting or excluding evidence unless the appellant demonstrates that “the error complained of has probably injuriously affected substantial rights of the parties.” Rule 45, Ala.R.App. P.; Atkins v. Lee, 603 So.2d 937, 946 (Ala.1992).
“In deciding whether to allow particular testimony, the court should focus on whether the testimony ‘tends to shed light on the main inquiry’ or draws attention from it.” Mason & Dixon Lines, Inc. v. Byrd, 601 So.2d 68, 72 (Ala.1992) (quoting Ryan v. Acuff, 435 So.2d 1244, 1247 (Ala.1983)).[5] In matters of child custody, “[t]he best interests of the child are always of paramount importance.” Tims v. Tims, 519 So.2d 558, 559 (Ala.Civ.App.1987). “ ‘It is the court’s duty to protect the interest of the children with scrupulous care.’ ” Howard v. Howard, 608 So.2d 753, 755 (Ala.Civ.App.1992) (quoting Vaughn v. Vaughn, 473 So.2d 1090, 1091 *1117 (Ala.Civ.App.1985)); see also Ex parte Barnard, 581 So.2d 489, 490 (Ala.1991).
The father’s offer of proof established that the purpose of his attempt to recall Dr. France Frederick was to provide evidence that was not available when Dr. Frederick testified initially. Further, the offer of proof demonstrated that, upon recall, Dr. France Frederick would have testified that, in her opinion, placing the daughter in the physical custody of the mother (even under a joint-physical-custody arrangement) was not in the daughter’s best interest and, in fact, would seriously psychologically and developmentally harm the daughter by unduly exposing her to the mother’s inappropriate behavior and fits of rage. See Graham, 640 So.2d at 964 (noting factors for consideration in a custody determination include the “ ‘character, stability, [and] mental and physical health’ ” of the parents and “ ‘the interpersonal relationship between [the] child and each parent’ ” (quoting Ex parte Devine, 398 So.2d 686, 696-97 (Ala.1981))); Tims v. Tims, 519 So.2d at 559 (noting that a parent’s ability to provide for a child’s emotional and social needs is a factor in determining custody of the child). Thus, Dr. Frederick’s testimony upon recall would shed light upon the paramount inquiry before the court in this custody determination — what is in the daughter’s best interest? Moreover, there is no basis for a conclusion that her testimony would have been cumulative or that it would have otherwise detracted from that inquiry. Accordingly, we conclude that the trial court erred by refusing to allow the father to recall Dr. France Frederick to testify regarding a change in her custody recommendation in light of events that occurred and information gained after she first took the witness stand.
The trial court awarded the mother sole physical custody after erroneously refusing to allow the father to present testimony from Dr. France Frederick that would have had direct relevance to the propriety of placing the daughter in the mother’s sole physical custody. Under the circumstances, the father has met his burden of demonstrating that the trial court’s error in refusing to allow Dr. Frederick to be recalled as a witness prejudiced his rights. It follows that the Court of Civil Appeals’ decision to affirm trial court’s order granting the mother sole physical custody of the daughter is due to be reversed. In light of this holding, we need not further address the father’s argument that the Court of Civil Appeals erred in affirming the trial court’s custody determination because that determination was unsupported by the evidence. On remand, the trial court is to reconsider the custody award in light of all admissible evidence relevant to the best interests of the daughter.

II. Whether the Trial Court Erred in Ordering the Father to Pay the Mother $1,700 per Month in Alimony

The father argues that the trial court erred in ordering him to pay the mother $1,700 per month in alimony. The father makes $11,631.45 per month. After taxes and payment of expenses the trial court ordered him to pay (such as alimony, insurance, the note for the mother’s vehicle, the mortgage on the marital home, child support, etc.), the father is left with $2,039 per month. The mother makes $1,200 per month.[6] After receiving alimony in the amount of $1,700 per month, she will have an income of approximately $2,900 per month. This amount is $742 in *1118 excess of the figure she submitted to the court as her monthly expenses (not including the sum the mother listed as monthly living expenses attributed to the daughter, which are more than exceeded by the $992 per month the father was ordered to pay in child support and the $320 per month in private-school tuition he was also ordered to pay). In addition, the mother was awarded both of the family cars, with the father to make all remaining car payments on the mother’s car; the ability to live in the marital home until she remarries or until the daughter reaches the age of majority, whichever occurs first, while the father was ordered to pay the $1,400 monthly mortgage payment and to pay for any repairs on the house exceeding $200; one-half the equity in the house existing at the time of the divorce; one-half the value of the father’s retirement accounts at the time of the divorce (with the exception of a relatively small sum the father acquired before the marriage); the couple’s undivided one-half interest in a rental house; one-half the value of certain bank accounts; and $8,500 in attorney fees.
We are mindful that we “ ‘must consider the issues of property division and alimony together when reviewing the decision of the trial court.’ ” Ex parte Drummond, 785 So.2d 358, 361 (Ala.2000) (quoting Bushnell v. Bushnell, 713 So.2d 962, 965 (Ala.Civ.App.1997)). It is clear from the trial court’s order that at least some of the division of property was based on the trial court’s decision to award the mother full physical custody of the daughter. For example, the trial court awarded the mother the right to live in the marital home until she marries or until the daughter reaches the age of majority, while the father was ordered to make the $1,400 monthly mortgage payment and to pay for any repairs to the house exceeding $200. We recognize that, under the facts of this case, the trial court’s further review of the custody issue has the potential of requiring changes in the award of child support, the distribution of the marital estate, and the alimony award.
Therefore, because we reverse the decision of the Court of Civil Appeals affirming the custody award, the award of alimony is due to be vacated. Accordingly, we reverse the judgment of the Court of Civil Appeals insofar as it affirmed the trial court’s award of alimony, and we remand the case to the Court of Civil Appeals with instructions to remand the case for the trial court to vacate the award of alimony. On remand, the trial court may reconsider alimony, child support, and property division to the extent that its review of the custody issue warrants further action on those issues.

C. Conclusion

For the reasons stated above, we reverse the decision of the Court of Civil Appeals affirming the trial court’s award of physical custody of the daughter to the mother, and we remand the case to that court to, in turn, remand the case to the trial court. On remand, the trial court is to reconsider the custody award in light of all admissible evidence relevant to the best interests of the daughter, including the evidence discussed in this opinion.
Further, we reverse the decision of the Court of Civil Appeals affirming the alimony award, and we remand this cause to the Court of Civil Appeals with instructions to remand the case for the trial court to vacate the alimony award. On remand, the trial court also may reconsider alimony, child support, and property division in the course of revisiting the custody issue.
REVERSED AND REMANDED WITH DIRECTIONS.
*1119 LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.

. Pursuant to a pendente lite order entered by the trial court, the daughter remained with the mother and the father had visitation privileges during the time the parties' divorce case was pending in the trial court.

. Dr. France Frederick is the daughter of Dr. Alice Frederick, the parties' marriage counselor.

3. The mother was not present at the daughter's first two counseling sessions with Dr. France Frederick. The father was the parent who initially took the daughter to Dr. France Frederick for counseling. Subsequently, both the mother and the father cooperated in continuing to obtain Dr. France Frederick's services for the daughter.

4. The mother testified regarding the incident:
"[Father's counsel]: Visitation exchange, how long would it take, without any argument, for [the father] to come pick up [the daughter] and her overnight bag and clothes?
"[Mother]: As fast as he could write a check.
"[Father's counsel]: Without any argument about the check how long would it take? "[Mother]: A minute or two.
"[Father’s counsel]: How long did this scene take in front of [the daughter]? "[Mother]: Well, that day it took him twenty minutes to write the check.
"[Father's counsel]: And were you screaming at him in front of [the daughter]? "[Mother]: Yes, I was.
[[Image here]]
"[Faiher’s counsel]: Was it in the best interest of your daughter to be exposed to you yelling at [the father]?
"[Mother]: I would not be yelling at [the father] if he could just do what the Judge told him to do in status quo, which was pay the bills.
"[Father's counsel]: And he says he paid you an extra thousand dollars already, didn't he?
"[Mother]: Didn't I explain that already? He gave me 400 extra dollars.
"[Father's counsel]: Well, there is a dispute between you and [the father]. Does [the daughter] need to be brought into a dispute, ma'am?
"[Mother]: I don’t know how else to get money from him because he will not discuss it over the phone. He hangs up on me.”
(Emphasis added.)

. The mother cites Hagler v. Hagler, 50 Ala.App. 266, 269, 278 So.2d 715, 718 (Ala.Civ.App.1973), for the proposition that a court does not err in refusing to recall a previously examined witness when the anticipated area of inquiry on recall has been covered in the witness's earlier testimony. As the mother points out, the area of inquiry upon recall of Dr. France Frederick would technically have been the same "area of inquiry” covered in her initial testimony because her custody recommendation for the daughter would have been the subject of her testimony on both occasions. However, we find Hagler distinguishable because, in this case, the father sought to recall Dr. France Frederick to testify regarding events that occurred during a continuance in the trial and after her initial testimony and because of the need to modify her custody recommendation in light of those events and their impact on the daughter’s well-being. Hagler did not involve an attempt to recall a witness to give testimony that was not available when the witness first testified.

. The mother argues that $1,000 of her monthly income is "imputed income.” However, she testified at trial that she could make $1,000 per month or more in her antique business, and she receives $200 per month from a one-half interest in a rental house.