PARKER, Justice
(concurring specially).
I concur specially to write on the origin of the fundamental right of parents to direct the upbringing and care of their children. The main opinion in this case references Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), for the principle that parents have a fundamental right to direct the care and upbringing of their children. This right does not originate with Troxel, however; it has existed for millennia, an integral part of the institution of the family.

I. The family preexisted the state.

The family was the first of all human institutions. One man and one woman came together in covenant before God, and they, with the children God gave them, became the first human social structure. As William Blackstone wrote, “single families ... formed the first natural society,” becoming “the first though imperfect rudiments of civil or political society.” 1 William Blackstone, Commentaries on the Law of England, *47 (1765). There was no state: no one person had been given civil authority over another, to punish evil and to prevent oppression. Nor was there a church to provide structure and order in the worship of the Creator. Both of these necessary institutions would come later— indeed, they were prefigured in the discipline and worship of the family — but the “sacred” relationships, Montgomery v. Hughes, 4 Ala.App. 245, 58 So. 113 (1911), within the family came first.

II. The family, like the state and the church, is a legitimate governing authority within its own sphere.

The family is a separate and legitimate human government within its proper sphere. Like the state and the church, it possesses supreme authority within its *651 own legitímate bounds, with the rights and duties of its members ordained by “a higher authority.” Ex parte Sullivan, 407 So.2d 559 (1981). As John Locke wrote:
“But these two powers, political and paternal, are so perfectly distinct and separate; are built upon so different foundations, and given to so different ends, that every subject that is a father, has as much a paternal power over his children, as the prince has over his: and every prince, that has parents, owes them as much filial duty and obedience, as the meanest of his subjects do to theirs; and can therefore contain not any part or degree of that kind of dominion, which a prince or magistrate has over his subject.”
John Locke, Two Treatises of Government § 71. Family and state are separate yet overlapping, and each must respect the authority of the other.
Abraham Kuyper, a famous Dutch political leader, writer, and theologian, explained that the authority of the family was not dependent on the state, but independent of it, because it came directly from God.
“Behind these organic spheres, with intellectual, aesthetical and technical sovereignty, the sphere of the family opens itself, with its right of marriage, domestic peace, education and possession; and in this sphere also the natural head is conscious of exercising an inherent authority, — not because the government allows it, but because God has imposed it. Paternal authority roots itself in the very life-blood and is proclaimed in the fifth Commandment.”
Abraham Kuyper, The L.P. Stone Lectures for 1898-1899: Calvinism (Six Lectures Delivered in the Theological Seminary at Princeton), 123 (1898). Kuyper went on to equate state interference with parental rights to rebellion against proper civil government: “A people therefore which abandons to State Supremacy the right of the family ... is just as guilty before God, as a nation which lays its hands upon the rights of the magistrates.” Kuyper, at 127.

III. The fundamental right of parents existed before and independently of civil government.

As our Declaration of Independence made clear, we “are endowed by our Creator with certain unalienable Rights.” Those unalienable rights are not limited to “Life, Liberty, and the pursuit of Happiness”; they include all those rights that are “implicit in the concept of ordered liberty,” Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), and are therefore protected by the Ninth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. As the Supreme Court of Massachusetts has said: “We agree that parents possess a fundamental liberty interest, protected by the Fourteenth Amendment, to be free from unnecessary governmental intrusion in the rearing of their children.” Curtis v. School Comm. of Falmouth, 420 Mass. 749, 755, 652 N.E.2d 580, 585 (1995).
The Alabama Constitution provides similar protections. See Ala. Const.1901, § 1 (“That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness.”), and § 36 (“That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.”).
*652 The authority of parents to direct the upbringing and training of their children is a “principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.” Snyder v. Commonwealth of Mass., 291 U.S. 97, 105, 54 S.Ct. 380, 78 L.Ed. 674 (1934) (cited in Washington v. Glueksberg, 521 U.S. 702, 720, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997)). Those traditions, including the common law inherited from Britain and early American law derived from it, were rooted in Christian doctrine. Blackstone wrote that “[Cjhristianity is part of the laws of England.” 4 William Blackstone, Commentaries *59 (1726). As Justice Story said:
“One of the most beautiful boasts of our municipal jurisprudence is, that Christianity is a part of the common law, from which it seeks sanction of its rights, and by which it endeavors to regulate its doctrines. And, notwithstanding the specious objection of one of our distinguished statesmen, the boast is true as it is beautiful. There never has been a period in which the common law did not recognise Christianity as lying at its foundations.”
Joseph Story, A Discourse Pronounced Upon the Inauguration of the Author, as Dane Professor of Law, 20-21 (1829). Thomas Cooley, citing Justice Story, stated that “Christianity is a part of the common law of the State ... in this qualified sense, that its divine origin and truth are admitted...Thomas Cooley, A Treatise on the Constitutional Limitations, 670 (1903)(emphasis in original) (quoted in Hudgins v. State, 22 Ala.App. 403, 404, 116 So. 306, 307 (1928)). This Court has also recognized the influence of Christianity, noting “that [Cjhristianity is a part of the common law,” Goodrich v. Goodrich, 44 Ala. 670, 673 (1870), and that “Christianity ... is justly regarded, in a certain sense, as a part of the common law of the land.” Goree v. State, 71 Ala. 7, 9 (1881).
The Christian doctrine emphasized the role of parents in directing their children’s growth and development. From the birth of the first child, children were recognized as being a gift to parents from God (Gen. 4:1, 25; see also Psalm 127:3, stating that “children are a gift of the LORD”[3]). Speaking through Moses, God instructed children to honor their parents (“Honor your father and your mother, as the LORD your God has commanded you, that your days may be prolonged and that it may go well with you .... ” Deut. 5:16), and parents to teach their children (“These words, which I am commanding you today, shall be on your heart. You shall teach them diligently to your sons.... ” Deut. 6:6-7). Building on the natural concern of parents regarding their children’s future, the book of Proverbs encouraged parents to “[tjrain up a child in the way he should go, [e]ven when he is old he will not depart from it.” Proverbs 22:6. The Apostle Paul reminded the Ephesians of this parental responsibility, instructing them to “not provoke [their] children to anger, but bring them up in the discipline and instruction of the Lord.” Ephesians 6:4. And throughout Scripture, the relationship between parents and their children is used as an analogy to the relationship of God with His people (“But as many as received Him, to them He gave the right to become children of God....” John 1:12), emphasizing the significant and permanent nature of that relationship.
In the century before American independence, prominent legal scholars discussed the rights and responsibilities of parents in their writings on the law. For *653 example, Hugo Grotius, often considered the founder of modern international law,[4] affirmed the authority of parents to make decisions regarding their own children.[5] John Locke, whose works formed an essential part of the intellectual foundation for the American quest for liberty, stated that “parents have a sort of rule and jurisdiction over [their children],” a right that “arises from that duty which is incumbent on them, to take care of their off-spring.”[6] Similarly, Samuel von Puffendorf,[7] a well known, 17th-century German legal scholar whose works, along with those of Locke, provided a foundation for the more famous writings of William Blackstone,[8] noted that “[fjrom marriage spring children, over whom paternal authority has been established.” [9] Finally, Thomas Rutherforth, a lecturer and author whose works were noted for their influence on the development of American law,[10] argued that “since nature cannot be supposed to prescribe a duty to the parents without granting them the means, which are necessary for the discharge of such duty; it follows, that nature has given the parents all the authority, which is necessary for bringing up *654 the child in a proper manner.”[11]
Post-revolutionary American law continued to respect the rights of parents. Chancellor Kent, for example, discussing the liability of parents for the contracts of their children, stated that “[w]hat is necessary for the child is left to the discretion of the parent; ... there must be a clear omission of duty ... before a third person can interfere.... ” 2 James Kent, Commentaries on American Law *192-93 (1826).

IV. The fundamental right of parents in American jurisprudence.

The right of parents to direct the upbringing of their children was first addressed by the United States Supreme Court in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The Supreme Court concluded in Meyer that the right of the parents to have their children taught languages other than English was “within the liberty of the [Fourteenth] amendment.” 262 U.S. at 400. By enacting a law prohibiting the teaching of languages other than English to children before they graduated from the eighth grade, the Nebraska “Legislature ha[d] attempted materially to interfere ... with the power of parents to control the education of their own.” 262 U.S. at 401. Because “[n]o emergency ha[d] arisen which rendered] knowledge by a child of some language other than English so clearly harmful as to justify its inhibition with the consequent infringement of rights long freely enjoyed,” the Supreme Court was “constrained to conclude that the statute as applied [was] arbitrary and without reasonable relation to any end within the competency of the state.” 262 U.S. at 403.
Parental rights also formed the basis for the Supreme Court’s decision in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), which addressed an education statute that limited a child’s schooling to public schools, thereby making it impossible for parents to choose to place their children in private schools like the school run by the Society of Sisters. Citing Meyer, the Supreme Court concluded that “it [was] entirely plain that the [law] unreasonably interfered] with the liberty of parents and guardians to direct the upbringing and education of children under their control,” 268 U.S. at 534-35 and was therefore unconstitutional.
The rights of parents were reaffirmed in Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (noting that parental rights “undeniably warrant[ ] deference and, absent a powerful countervailing interest, protection”), and Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (upholding “[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child”).
Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), although primarily decided on First Amendment religious-freedom grounds, also made reference to parental rights. Because of the Free Exercise Clause in the First Amendment, as applied to the states by the Fourteenth Amendment, Wisconsin’s compulsory-education statute could not constitutionally punish Amish parents who, in keeping with their religious beliefs, did not send their children to high school. 406 U.S. at 235. The Supreme Court also noted the overlap of the parents’ religious freedom and their parental rights:
*655 “[T]his case involves the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children. The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.”
406 U.S. at 232.
Even before Meyer and Pierce, this Court had recognized the rights of parents. In Montgomery v. Hughes, 4 Ala.App. 245, 247, 58 So. 113, 113-14 (1911), this Court wrote that “[t]he laws of nature teach us that the relation of parent and child is sacred” and that “the parent is entitled to the care and custody of his child, unless some good cause is shown why he should not have such care and custody.”[12] Four decades later, this Court cited approvingly a decision of the California Supreme Court, which in turn quoted Pierce and several other cases affirming parental rights:
“ ‘This is in line with the principle that “The essence of custody is the companionship of the child and the right to make decisions regarding his care and control, education, health, and religion”, Lem.er v. Superior Court, 38 Cal.2d 676, 681, 242 P.2d 321, 323 [ (1952) ], and “It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 [ (1925) ], supra. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter”, Prince v. [Com. of] Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 [(1944)]....’”
Griggs v. Barnes, 262 Ala. 357, 363, 78 So.2d 910, 916 (1955) (quoting In re Guardianship of Smith (Howes v. Cohen), 255 P.2d 761, 762 (Cal.1953)). See also R.J.D. v. Vaughan Clinic, P.C., 572 So.2d 1225, 1227-28 (Ala.1990) (“The common law deems parental care for children not only an obligation, but a fundamental right: ‘.... The will of the parents is controlling, except in those extreme instances where the state takes over to rescue the child from parental neglect or to save its life.’ ” (quoting 59 Am.Jur.2d Parent and Child § 48 at 194 (1987))). As this Court said in Ex parte Sullivan, 407 So.2d 559, 563-64 (1981): “The law recognizes that a higher authority ordains natural parenthood, and a fallible judge should disturb the relationship thus established only where circumstances compel human intervention.”
State action that limits a fundamental right is generally subject to strict scrutiny. Troxel, 530 U.S. at 80 (Thomas, J., concurring in judgment); Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (“[C]lassifications affecting fundamental rights ... are given the most exacting scrutiny.”). Strict scrutiny generally requires that the state show a compelling interest, advanced by the least restrictive means. Graham v. Richardson, 403 U.S. 365, 375, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (“It is enough to say that the classification involved in Shapiro [v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969),] was subject *656 ed to strict scrutiny under the compelling state interest test ... because it impinged upon the fundamental right of interstate movement.”).
The courts of this State have not always respected this fundamental right. A sta-tist philosophy that appeared briefly and sporadically in American jurisprudence in the early 20th century during the growth, worldwide, of national socialism represented an aberration from our founding principles and was quickly rejected. See Burns v. Shapley, 16 Ala.App. 297, 77 So. 447 (1917):
“The theory upon which the court proceeds in such cases is that the custody and control of the parent over his minor children is a trust committed to him by the state, and this trust is dominated by the supreme guardianship of the state as parens patriae of all infants within its border, and when the parent abuses the trust so as to endanger the welfare of the child, in such sort as to hamper or retard its development into a good citizen, the interest of society requires the state to assert its supreme guardianship and protect its ward.
“It has been said:
“ ‘Minors are the wards of the nation, and even the control by the parent is subject to the unlimited supervisory control of the state’ and that ‘the supreme right of the state to the guardianship of children controls the natural rights of the parent when the welfare of society or of the children themselves conflicts with parental rights.’ ”
16 Ala.App. at 299, 77 So. at 449 (citations omitted). The philosophy expressed by the Court of Appeals in Bums directly undermined the relationship between parents and children; under that philosophy, rather than being “ordained” by a “higher authority,” Sullivan, supra, that relationship existed only as a creation of the state. That view was rejected by this Court in Griggs, supra, and by the United States Supreme Court in Meyer and Pierce, supra, decided in the decade following Bums.

V. Misuse of the best-interests-of-the-child, standard.

The dissent in this case “would focus on the best interests of the child.” 73 So.3d at 681 (Main, J., dissenting), but the best interests of a child normally requires protecting parental rights. A child’s best interests are protected, for example, by permitting the termination of parental rights only when “ ‘clear and convincing evidence reveals that the parents cannot, or are unwilling to, discharge [their parental] responsibilities.’” Ex parte J.R., 896 So.2d 416, 423 (2004) (quoting J.V. v. State Dep’t of Human Res., 656 So.2d 1234, 1235 (Ala.Civ.App.1995)). Even then, after there is “ ‘clear and convincing evidence that the child is dependent,’ ” the court “ ‘must determine whether there exists a remedy less drastic than termination of those rights.’” Ex parte J.R., 896 So.2d at 423 (quoting Ex parte Brooks, 513 So.2d 614, 617 (Ala.1987)).
The Alabama Grandparent Visitation Act (“the Act”), and the dissent seeking to uphold it, misapply the best-interests-of-the-child standard. Although, as the dissent correctly notes, a child’s best interests are considered by the courts in a wide variety of legal situations, from adoption (e.g., §§ 26-10A-24 and -25, Ala.Code 1975) to juvenile delinquency (e.g., § 12-15-101(a)(2), (a)(3), and (d), Ala.Code 1975), the best-interests-of-the-ehild standard is properly applied only in circumstances where the standard does not conflict "with parental rights. Instead, it is applied to weigh the competing claims of *657 fit parents, or if the parents are unfit, the claims of fit potential guardians.
Where a court must make an initial determination of custody in a divorce or paternity proceeding, for example, and both parents are fit, possessing coequal fundamental rights, the best-interests-of-the-child standard guides the court in determining which of the fit parents should receive custody.
“ ‘Alabama law gives neither parent priority in an initial custody determination. Ex parte Couch, 521 So.2d 987 (Ala.1988). The controlling consideration in such a case is the best interest of the child.’ Ex parte Byars, 794 So.2d 345, 347 (Ala.2001). See also Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994) (‘In an action between parents seeking an initial award of custody, the parties stand on equal footing and no presumption inures to either parent. Hall v. Hall, 571 So.2d 1176 (Ala.Civ.App.1990). The trial court’s overriding consideration is the children’s best interests and welfare. Santmier v. Santmier, 494 So.2d 95 (Aa.Civ.App.1986).’).”
Ex parte Clark, 23 So.3d 1107, 1116 (Ala.2009).
Similarly, when the rights of a depen-dant child’s parents are terminated, the best-interests standard is applied by the courts to determine who should receive custody, but only after both parents are found to be unfit. As this Court said in Ex parte Beasley, 564 So.2d 950 (Ala.1990):
“In viewing the ‘dependency1 issue in the context of the State’s attempt to terminate parental rights, the State would have standing only where both parents are found to be unfit or otherwise unable to discharge the responsibilities of parenthood. Therefore, a finding of ‘dependency’ would be warranted, and the State would have a duty to act in accordance with that child’s best interest.”
564 So.2d at 954.[13] Where both parents are unfit, their parental rights no longer provide the court any guidance, and the best-interests-of-the-child standard applies to balance the claims of competing parties.
The Act ignores the first step of the analysis — the required finding of unfitness — and, instead, treats all parents as unfit and permits the court to grant grandparent visitation whenever it believes that visitation to be in the best interests of the child. The Act permits a court to use the best-interests-of-the-child standard to override the wishes of fit parents at the request of a third party and thereby to undermine the relationship of those parents with their children. This is not only unconstitutional, as discussed in the main opinion; it is also fraught with the danger of unintended consequences.
Once taken out of context, the best-interests-of-the-child standard has been used to justify a variety of inappropriate results. The best-interests standard has been misapplied, for example, to grant a *658 parent’s former same-sex partner custody of or visitation with the parent’s child against the parent’s wishes. In Jones v. Jones, 884 A.2d 915 (Pa.Super.Ct.2005), a Pennsylvania court used the “child’s best interests” to justify awarding custody to a third party over the objection of the natural parent. According to the court:
“Once it is established that someone who is not the biological parent is in loco parentis, that person does not need to establish that the biological parent is unfit, but instead must establish by clear and convincing evidence that it is in the best interests of the children to maintain that relationship or be with that person.”
884 A.2d at 917. Similarly, the Washington Supreme Court ruled that a “de facto parent” — a nonparent third party who played a parent-like role — was “entitled to any parental privileges ... determined to be in the best interests of the child,” even over the objections of the child’s natural parents. In re Parentage of L.B., 155 Wash.2d 679, 708, 122 P.3d 161, 177 (2005). The Supreme Court of North Carolina reached the same conclusion, finding that because the fit parent had “acted inconsistently with her paramount parental status” by permitting the parent’s former same-sex partner to have a parent-like relationship with the parent’s child, a finding of unfitness was unnecessary, and the application of the best-interests-of-the-child standard was appropriate. Boseman v. Jarrel, 704 S.E.2d 494, 503, 505 (N.C.2010). Thus, even though “this [was] not a case in which the natural parent [was] unfit, or ha[d] abandoned or neglected the child,” the North Carolina Supreme Court upheld the trial court’s decision to grant joint custody to the parent and the nonpar-ent. Boseman, 704 S.E.2d at 503. Once the best-interests-of-the-child standard is cut loose from its mooring, from its proper place in American jurisprudence, it can drift, taking on a life of its own, leading to unintended and often undesirable results.[14]

VI. Conclusion.

There is no evidence before us to show that the State has a compelling interest in granting visitation in this case over the objection of fit parents or that any interest the State may have in maintaining grandparent-grandchild relationships could not be advanced by some less restrictive means. The Act is an “unnecessary governmental intrusion in the rearing of their children,” Curtis, 420 Mass. at 755, 652 N.E.2d at 585, an intrusion into “the private realm of family life which the state cannot enter,” Griggs, 262 Ala. at 363, 78 So.2d at 916. Moreover, the Act creates a wholly new use for the best-interests-of-the-child standard, making it a weapon for third parties to use against fit parents. The Act therefore violates the fundamental right of parents and is unconstitutional.

. All Scripture quotations are from the New American Standard Bible.

. See, e.g., Hamilton Vreeland, Jr., Hugo Grotius: The Father of the Modem Science of International Law (1917).

. Hugo Grotius, The Rights of War and Peace, The Preliminary Discourse, ¶ 15 (1625).

. John Locke, Two Treatises of Government §§ 55, 58. Like Samuel von Puffendorf, Locke also discussed the limitations on that authority and how it might be forfeited.

. His name is often also spelled "Pufendorf"; however, because it has previously been spelled "Puffendorf" in the decisions of this Court, we continue to use that spelling here.

. See, e.g., Alden v. Maine, 527 U.S. 706, 766-67, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (Souter, J., dissenting), citing Blackstone, and noting his reliance on Puffendorf and Locke. Indeed, in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), one of the earliest decisions of the United States Supreme Court, Blackstone was quoted as citing Puffendorf on the subject of sovereign immunity. 2 U.S. (2 Dall.) at 442. Puffendorf's writings were also directly cited before and by the United States Supreme Court in the early days of our republic; Justice Joseph Story listed Puffendorf next to Grotius and Emme-rich de Vattel as legal authorities; see The Nereide, 13 U.S. (9 Cranch) 388, 437, 3 L.Ed. 769 (1815); see also Brown v. United States, 12 U.S. (8 Cranch) 110, 132, 134, 140, 3 L.Ed. 504 (1814) (Story, J., dissenting). He is most frequently cited, however, both in the decisions of the United States Supreme Court and this Court, for his illustration from Bolog-nian law of how legal principles should never be interpreted to produce an absurd result. See, e.g., Holy Trinity Church v. United States, 143 U.S. 457, 461, 12 S.Ct. 511, 36 L.Ed. 226 (1892); Lash v. State, 244 Ala. 48, 52, 14 So.2d 229, 231 (1943).
For further discussion of Puffendorf’s influence, see Bernard Baily, The Ideological Origins of the American Revolution, 43 (1992), noting that Puffendorf's writings were published in conjunction with those of Locke, Edward Coke, and Grotius; see also Thomas C. Gray, Origins of the Unwritten Constitution: Fundamental Law in American Revolutionary Thought, 30 Stan. L.Rev. 843, 860 (1978) (“Except for Grotius, the authors of these public law treatises are little known and almost never read today, but in the 18th and early 19 th centuries, the works of Pufendorf, [Jean Jacques] Burlamaqui, Vattel and [Thomas] Rutherforth had prestige and influence, and helped shape the constitutional ideas of the American colonists.”).

. 2 Samuel von Puffendorf, On The Duty of Man and Citizen ch. 3, ¶ 1 (1682) (Frank Gardner Moore, trans. 1925). Puffendorf went on to discuss the limitations on those parental rights and the cases in which they might be forfeited through misuse or abandoned to another. Id. at ¶ 4, 7, 9.

. See, e.g., Gaiy L. McDowell, The Limits of Natural Law: Thomas Rutherforth and the American Legal Tradition, 37 Am. J. Juris. 57, 58 (1992), noting that Rutherforth's “Institutes of Natural Law was a work widely read and cited among those of the Founding generation and of the first generation under the Constitution of 1787.”

. Thomas Rutherforth, Institutes of Natural Law 166 (3d ed. 1799).

. Although this case was originally decided by the Alabama Supreme Court, it was reassigned to the newly created Court of Appeals on rehearing, and both decisions were reported as a single case.

. Although the applicable statute, § 12 — 15— 319, Ala.Code 1975, does not use the term "fit," it nonetheless makes the unfitness of the parents a preliminary requirement for the termination of parental rights:
"If the juvenile court finds ... that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents...."
§ 12-15-319(a). The statute goes on to list factors that may be considered by the court, including abandonment, abuse, illness, and criminal activity. (Note that under § 12 — 15— 311, Ala.Code 1975, a child may be declared "dependent,” as that term is defined in § 12-15-102, without terminating parental rights.)

. The best-interests standard is urged by the United Nations as a stand-alone standard to be used by legislative bodies of national governments. "In all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration.” Convention on the Rights of the Child, Nov. 20, 1989, art. 3, 1577 U.N.T.S. 3 (entered into force Sept. 2, 1990) (not ratified by the United States). The United Nations Convention would take the best-interests-of-the-child standard, used for decision-making, and turn it into an independent right of the child that would offset the fundamental right of parents.